THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| Garrity Power Services LLC,<br>    Plaintiff,<br><br>v.<br><br>Samsung Electronics Co. Ltd. and Samsung Electronics America, Inc.,<br><br>    Defendants. | Civil Action No.: 2:20-cv-00269<br><br>JURY TRIAL DEMANDED |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

1. This is an action for patent infringement of United States Patent No. 9,906,067 (the "'067 Patent") in which Garrity Power Services LLC ("GPS" or "Plaintiff") makes the following allegations against Samsung Electronics Co. Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung" or "Defendants"):

**I.   PARTIES**

2. Plaintiff GPS is a limited liability company organized under the laws of the State of Texas and has its principal place of business at 1830 Kelly Lane, Rockwall, Texas 75087.

3. On information and belief, Defendant Samsung Electronics Co. Ltd. ("SEC") is a corporation organized and existing under the laws of the Republic of Korea with a principal place of business located at 129, Samsung-ro, Yeongtong-gu, Suwon-si, Gyonggi-do, Korea 443-742.

4. On information and belief, Defendant Samsung Electronics America, Inc. ("SEA") is a corporation organized and existing under the laws of the State of New York, with a principal place of business located at 85 Challenger Road, Ridgefield Park, New Jersey 07660. SEA has corporate offices in the Eastern District of Texas at 1301 E. Lookout Drive, Richardson, TX 75082 and 2800 Technology Drive, Suite 200, Plano, Texas 75074.  SEA is believed to be a

wholly-owned subsidiary of SEC and is SEC's U.S. subsidiary that sells consumer electronics goods and mobile devices in the United States.  SEA may be served via its registered agent for service of process: C T Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

5.     Defendants have authorized sellers and sales representatives that offer and sell products pertinent to this Complaint throughout the State of Texas, including this District and to consumers throughout this District, such as, through Defendants' ecommerce website, www.samsung.com.

## II.  JURISDICTION, VENUE, AND JOINDER

6.     This action arises under the patent laws of the United States, Title 35 of the United States Code.

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.     Each of the Defendants is subject to this Court's specific and general personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

9.     Personal jurisdiction exists generally over the Defendants because each of the Defendants has sufficient minimum contacts with the forum as a result of business conducted within the State of Texas and the Eastern District of Texas, and each of the Defendants is or should be registered with the Secretary of State to do business in the State of Texas.  Personal jurisdiction also exists over each of the Defendants because each, directly or through subsidiaries or intermediaries, makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products within the State of Texas and the Eastern District of Texas that infringe one or more claims of the patent asserted in this Complaint, as alleged more particularly below.

10.    Venue is proper in this district under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b) because each of the Defendants is subject to personal jurisdiction in this District and has committed acts of infringement in this District.  Each of the Defendants, through its own acts and/or through the acts of others (including each other Defendant) acting as its representative,

alter ego, or agent, makes, uses, sells, and/or offers to sell infringing products within this District, has a continuing presence within the District, and has the requisite minimum contacts with the District such that this venue is a fair and reasonable one.  Upon information and belief, each of the Defendants has transacted, and at the time of the filing of the Complaint, is continuing to transact business within this District.

11.     Defendants are properly joined under 35 U.S.C. § 299(a)(1) because, as set forth in greater detail below, Defendants, through their own acts and/or through the acts of each other Defendant acting as its representative, alter ego, or agent, commonly and/or jointly manufacture, use, import, sell, and/or offer for sale infringing accused products (described in more detail below), such that at least one right to relief is asserted against Defendants jointly, severally, and in the alternative with respect to the same transactions, occurrences, or series of transactions or occurrences relating to the making, using, selling and/or offering to sell in, and/or importing into the United States the same accused products.

12.     Defendants are properly joined under 35 U.S.C. § 299(a)(2) because, as set forth in greater detail below, Defendants, through their own acts and/or through the acts of each other Defendant acting as its representative, alter ego, or agent, make, use, sell and/or offer to sell in, and/or import into the United States the same or similar accused products, such that questions of fact will arise that are common to all Defendants.

13.     Upon information and belief, each of the Defendants serves as representative, alter ego, and/or agent of each other Defendant for the purposes of conducting business in the United States and this District as relates to making, using, selling, offering to sell, and importing into the United States infringing goods and services.

14.     In addition, upon information and belief, Defendant SEC, along with its numerous subsidiaries including Defendant SEA, operates as a single enterprise operating under the "Samsung" brand.  Defendant SEC, along with its numerous subsidiaries including SEA, each exercises direction and control over the performance of each other, or they form a joint enterprise such that the performance by one is attributable to each other.

### III. BACKGROUND

#### A. The '067 Patent

15. Plaintiff GPS is the owner by assignment of United States Patent No. 9,906,067 (the "'067 Patent") titled "Apparatus, System and Method to Wirelessly Charge/Discharge a Battery." The '067 Patent was duly issued by the United States Patent and Trademark Office ("USPTO") on February 27, 2018. A true and correct copy of the '067 Patent is attached hereto as Exhibit A.

16. Mr. Paul Garrity of Rockwall, Texas and Mr. Aaron Jungreis of Ra'anana, Israel are named inventors for the '067 Patent.

17. GPS owns by assignment all right, title, and interest in and to the '067 Patent, including the right to all remedies for past and ongoing infringement thereof.

18. The '067 Patent generally relates to bidirectional wireless charging. It provides many advantages over conventional systems. It provides safety advantages over a wired system, while also providing efficient and bidirectional charging capabilities. It further may reduce need for metallic contacts, thereby reducing concerns of corrosion of battery contacts. It further may reduce need for devices to be connected to the utility grid to recharge. It allows a single battery to wirelessly interface with many devices. It also allows for efficient transfer of power in both directions and may regulate an output characteristic (e.g., an output voltage) and may obviate the need for a post regulator regardless of the direction of power transfer.

#### B. Inventors; GPS; Neosen Energy

19. Mr. Garrity was born and raised in and around Wishaw, Scotland, United Kingdom. He attended Edinburgh Napier University where he earned—with honors—a Bachelor of Engineering in Electrical, Electronics and Communications Engineering in 1992. Mr. Garrity has more than 30 years' experience in the design and product development business. He moved to the United States in 1996. He has resided and worked in and around the Dallas-Plano-Rockwall area of Texas since 2004, where he raised his family.

20. Mr. Garrity founded GPS in 2005 and is the chief executive officer (CEO) of

GPS. GPS is a company focused on technologies delivering smart wireless and energy products to the Industrial Medical, Automotive and Consumer markets, in North America, Europe, and Asia. With an emphasis on handset, tablet, and laptop integration, GPS leads the market in technology and innovation. GPS has expertise in leveraging innovative technology in wireless charging, energy harvesting, and isolated power and radio systems, among other things.

21. In addition, Mr. Garrity founded a company called Neosen Energy LLC ("Neosen") in 2014. Mr. Garrity is also the CEO of Neosen. Neosen has its principal place of business in Plano, Texas, where it has offices, an engineering lab, and a manufacturing facility, among other things. Neosen also has offices located in Sha Tin, Hong Kong. Neosen, *inter alia*, designs, manufactures, and sells products related to wireless charging, RF systems, and disposable sensor tags. Neosen manufactures certain products out of its Plano headquarters and also uses off-shore manufacturing for higher volume production. Neosen employs (including contractors) approximately thirteen persons, with the majority working out of Neosen's Plano headquarters.

22. The below photographs depict portions of the engineering lab and manufacturing facility, respectively, where Mr. Garrity works:





23. Prior to launching GPS, Mr. Garrity worked in a variety of senior technical and managerial roles (e.g., vice president and chief technology officer) at well-known technology enterprises, including GEC Marconi (UK) Minebea, Flextronics, LSGC, FlexPower, and Enecsys. Over his tenure, Mr. Garrity has successfully innovated and developed several key products for IBM, Dell, Apple, HP, Microsoft, Canadian Solar, and Toshiba.

24. Leaving the UK in 1996, Mr. Garrity led efforts to setup design and manufacturing in the United States for the Minebea Group and for providing product solutions to Dell, Sony, and HP.

25. Mr. Garrity is the inventor of over 43 patents and continues to innovate with additional publications in process.

26. Dr. Jungreis, the second named inventor on the '067 Patent, is currently employed as a research and development engineer for GPS and Neosen. He currently resides in Ra'anana, Israel. He has worked for GPS since 2013 to present; he has also worked for Neosen since 2014 to present.

27. Dr. Jungreis was awarded a Bachelor of Science in Electrical Engineering by the Massachusetts Institute of Technology (MIT) in 1983. He was also awarded a Masters in Electrical Engineering by Cornell University in 1984. He was also awarded a PhD in Electrical Engineering by Duke University in 1993.

28. Since then, Dr. Jungreis has held numerous senior engineering position with various companies. He is the named inventor on over 40 issued United States patents and has published numerous scholarly articles.

29. Mr. Garrity and his companies have received numerous awards related to their technological achievements. For instance,

- Innovation awards, Gold Medal winner with congratulation from juries, 45th Geneva Inventions (Innovative Portable Solar System);
- Innovation awards, Gold Medal winner with congratulation from juries, 46th Geneva Inventions (Cattle Tracking System);

- TechCrunch 2016 San Francisco Disrupt Pavilion Alley (Power Beam Technology);
- Korea BIXPO 2017 Green Technology Award, Bronze Medal Winner (Portable Solar System);
- Korea BIXPO 2018 Green Technology Award, Gold Medal Winner (Elderly Tracking System);
- HKAI Awards for Industries 2017, Certificate of Merit, Machinery and Equipment (Portable Solar System);
- HKAI Awards for Industries 2018, Innovation Medal, Machinery and Equipment (Cattle Tracking system);
- HKAI Awards for Industries 2018, Certificate of Merit, Technological Achievement (Cattle Tracking System);
- Hong Kong Environment Excellence Award 2017, Certificate of Merit, Green Innovation Award (Portable Solar System);
- CES Innovation Award 2019, Smart Energy (Disposable Printable Battery on Asset Tracking Tags); and
- R&D100 Awards 2019 (A Green Battery Printed on LoRa IoT Devices).

30. Certain of those awards relate to technologies that include wireless charging.

**C.  The Accused Products**

31. Upon information and belief, Defendants make, import, use, sell, and/or offer to sell in the United States, directly or through intermediaries, mobile devices that wirelessly charge and discharge a battery (the "Accused Products," further defined below).

32. The Accused Products include at least Defendants' products that support the feature advertised by Defendants as "Wireless PowerShare" (the "Wireless PowerShare" feature).

33. The Accused Products include at least the following "Samsung"-branded

products:

- Galaxy Fold;
- Galaxy Note10, Note10+, and Note10+ 5G;
- Galaxy S10e, S10, S10+, and S10 5G;
- Galaxy Z Flip;
- Galaxy S20 5G, S20+ 5G, and S20 Ultra 5G; and
- Galaxy Note20 and Note20 Ultra 5G.

34. Defendants' Wireless PowerShare feature has been highly touted in Defendants' marketing and advertising and other promotional activities, e.g., as shown:



(Official Phone Commercials HD, *Samsung Galaxy S10 Official Ad*, YOUTUBE.COM (Feb. 20, 2019))[1]

\*   \*   \*

---

[1] Available at https://www.youtube.com/watch?v=r2Zl67Jlhno (last visited Aug. 13, 2020).

> **OUR VERDICT**
>
> The Galaxy S10 is a fitting 10th anniversary phone for Samsung and its storied S series. It delivers on change with a novel-looking Infinity-O screen so large it displaces the front camera, and a triple-lens rear camera that takes ultra-wide photos. Its in-screen fingerprint sensor tech should serve you well, while its Wireless PowerShare could serve your friends well. That's a lot of change – just know that it comes at a high price and the Galaxy S10e and S10 Plus flank it from both sides of the coin as better options.
>
> **⊕ FOR**
> High screen-to-body ratio
> In-screen fingerprint sensor
> Wireless PowerShare perk
>
> **⊖ AGAINST**
> Stunning price hike
> S10e and S10 Plus are better
> Great camera, but not the best

. . . .

> We had no difficulty activating Samsung's Wireless PowerShare feature after turning it on via the quick settings notification shade. We placed our Galaxy Buds case on the lower third of the S10 back and the earbuds began charging almost instantly. It even charged our iPhone XS Max.
>
> Samsung laid out two scenarios in which Wireless PowerShare would be helpful: charging a friend's phone, or charging your Galaxy Buds at night, effectively making your plugged-in S10 a mobile Qi charger pad. Samsung noted, though, that PowerShare won't work when the phone is below 30%.

(M. Swider et al., *Samsung Galaxy Note 10 review*, TECHRADAR.COM)[2]

\* \* \*

> Wireless charging is on hand, and you'll also be able to use Samsung's Wireless PowerShare feature to charge compatible devices like headphones, smartwatches or other phones from your Note 10.

---

[2] Available at https://www.techradar.com/reviews/samsung-galaxy-s10 (last visited Aug. 13, 2020).

> That's super handy for when you have a device that has run out of battery, such as Samsung's Galaxy Buds headphones. Perhaps the most exciting part of this feature though is that you can use it to recharge other smartphones.
>
> Your friend ran out of charge while you're in the pub? Set up your Note 10 to do PowerShare in the settings and you'll be able to place their device on top of yours to pump it with a slight amount of battery (assuming their phone supports wireless charging).

(J. Peckham, *Samsung Galaxy Note 10 review*, TECHRADAR.COM)[3]

### D. Defendants' Notice of the '067 Patent and Willful Infringement

35. On or around April 11, 2019, a representative of GPS initiated communications with representatives of Defendants regarding Defendants' interest in discussing intellectual property matters. This began a months-long series of communications (as described below in more detail). In particular, such communications included representatives of Defendants who are attorneys and have senior roles related to handling intellectual property matters for Defendants.

36. Defendants' representative initially expressed interest. In response, GPS's representative sent Defendants' representatives a copy of the '067 Patent (as an attachment) on April 11, 2019.

37. Over the next several months, Defendants' representatives continued to communicate regarding the '067 Patent with GPS's representative.

38. At one point, around May 23, 2019, in order to advance negotiations, GPS's representative offered to provide Defendants with a claim chart showing how the '067 Patent's claims covered Defendants' products. Defendants' representative declined the offer for a claim chart, but indicated a nondisclosure agreement ("NDA") would facilitate negotiations. On June 14, 2019, Defendants' representative requested certain information from GPS expressly for the

---

[3] Available at https://www.techradar.com/reviews/samsung-galaxy-note-10-review-and-specs/2 (last visited Aug. 13, 2020).

purpose of drafting a NDA.  GPS's representative agreed to conduct further discussions under a NDA and promptly supplied the requested information.  However, Defendants never provided GPS with a draft NDA.

39. Instead, on or around August 12, 2019, Defendants' representative informed GPS's representative that Defendants were not interested in the '067 Patent.

40. Although Defendants were on actual notice of the '067 Patent since at least April 11, 2019, on information and belief, Defendants did nothing to avoid infringement of the '067 Patent.  Alternatively, on information and belief, Defendants did take certain steps to avoid infringement of the '067 Patent; that confirms that Defendants infringed at least as to products sold prior to taking such steps to avoid infringement and confirms Defendants' subjective belief and knowledge that they infringed the '067 Patent.  In either scenario, Defendants were required to obtain authorization (e.g., take a license) to practice the '067 Patent.

41. Instead of duly obtaining authorization or a license to practice the '067 Patent, Defendants continued making, using, selling, offering for sale, and importing into the United States existing Accused Products (e.g., the Galaxy S10 line launched around March 2019) and also incorporated the infringing technology into new Accused Products (e.g., the Galaxy Note 10 and S20 lines launched around August 2019 and March 2020, respectively).

42. Moreover, even while in discussion with GPS regarding the '067 Patent, Defendants were actively producing marketing materials specifically touting and promoting the accused Wireless PowerShare feature.  For example, Defendants produced a television advertisement entitled "Galaxy S10: Wireless PowerShare" that was released around April 24, 2019, e.g., as shown:



Samsung US, *Galaxy S10: Wireless PowerShare*, YOUTUBE.COM (Apr. 24, 2019).[4] That advertisement is exclusively dedicated to promoting Defendants' infringing Wireless PowerShare feature. That advertisement was extensively aired and disseminated on television networks and online media, among other means, between March and August of 2019.

43.     Indeed, even as late as August of 2019 (when Defendants broke-off discussions with GPS), Defendants were actively advertising and promoting their Wireless PowerShare feature. For example, on or around August 6, 2019, Defendants aired the "Galaxy S10: Wireless PowerShare" television advertisement (depicted above) on the television network, MLB Network.

44.     In another example, around August 2019, Defendants supplied pre-release models of its accused Galaxy Note 10 line of devices to various media outlets, tech reporters, influencers, and the like. On information and belief, Defendants had supplied information

---

[4] Available at https://youtu.be/4S8n9SmcXLE (last visited Aug. 13, 2020).

related to the Wireless PowerShare feature and encouraged such media outlets, tech reporters, influencers, and the like to promote the accused Wireless PowerShare feature. This resulted in the promotion of the Wireless PowerShare feature for the Note 10 line.

45. On information and belief, Defendants have spent millions of dollars promoting its Wireless PowerShare feature. Defendants have earned and continue to earn hundreds of millions of dollars in United States revenues based on sales of devices supporting the Wireless PowerShare feature.

46. On information and belief, during the negotiation period between March and August of 2019, Defendants actively evaluated the '067 Patent and came to the conclusion that they needed a license to practice the '067 Patent. Alternatively, Defendants did not make a good faith effort to evaluate the '067 Patent (e.g., by refusing to evaluate a claim chart that was offered to be provided by GPS) and willfully blinded themselves to their need to obtain a license to practice the '067 Patent. Regardless, Defendants failed to negotiate in good faith, which further demonstrates bad faith and egregious conduct.

### IV. COUNT ONE — INFRINGEMENT OF U.S. PATENT NO. 9,906,067

47. Defendants have not been and are not authorized to practice the '067 Patent.

**A. Direct Infringement**

48. Defendants have infringed the '067 Patent during its term in the State of Texas, in this District, and elsewhere in the United States, by, among other things, directly or through intermediaries, making, using, selling, offering for sale, and importing the Accused Products that are covered by at least claims 1 and 15 of the '067 Patent to the injury of Plaintiff GPS. Defendants have and continue to directly infringe, literally and/or under the doctrine of equivalents, the '067 Patent. Defendants are thus liable for infringement of the '067 Patent pursuant to 35 U.S.C. § 271.

49. An exemplary chart is attached hereto as Exhibit B detailing the manner in which the Accused Products infringe the '067 Patent by way of a representative example using

Defendants' Galaxy S10 device.

50. As exemplified in Exhibit B, each of the Accused Products includes, *inter alia*: a first magnetic core piecepart having a first metallic coil encircling at least a portion thereof and configured to be coupled to, aligned with and removable from a second magnetic core piecepart having a second metallic coil encircling at least a portion thereof to form a transformer; and a battery metallically coupled to said first metallic coil and configured to be charged and discharged through an electrically isolating path of said transformer.

51. On information and belief, each of the Accused Products is materially the same with respect to infringement as shown in the exemplary chart, Exhibit B.

**B.     Indirect Infringement**

52. As discussed *supra*, Defendants have actual notice of the '067 Patent and their infringing activities relating to the '067 Patent no later than April 11, 2019 and certainly no later than the filing of this case. Alternatively, Defendants willfully blinded themselves as to their infringing activities and need to obtain a license to the '067 Patent (e.g., by failing to make a good faith effort to evaluate the '067 Patent and by refusing to evaluate a claim chart that was offered to be provided by GPS).

53. Defendants have been and are indirectly infringing the '067 Patent by actively inducing or contributing to the direct infringement by others of the '067 Patent, specifically at least claims 1 and 15, in the United States, the State of Texas, and the Eastern District of Texas.

54. Defendants have induced and continue to induce through affirmative acts each other, their customers, and other third parties, such as resellers and end-consumers of the Accused Products, to directly infringe the '067 Patent by making, using, selling, and/or importing the Accused Products. The affirmative acts of inducement by Defendants include, but are not limited to, any one or a combination of: (i) manufacturing, selling, distributing, and/or otherwise making available the Accused Products; (ii) providing instructions, documentation, and other information to customers and end-users suggesting they use the Accused Products in an infringing manner, including in-store

technical support, online technical support, marketing, product manuals, advertisements, and online documentation; (iii) enabling and encouraging the use, sale, or importation of infringing devices by its customers, testers, marketers, end-user, and the like; (iv) advertising and promoting the infringing devices and/or technology; (v) designing the Accused Product with specialized hardware and software (including, e.g., user interface and coil assembly) for infringement; (vi) collaborating on and/or funding the development of the infringing devices and/or technology with third-parties; (vii) soliciting and sourcing the manufacture of infringing devices; (viii) licensing and transferring technology and know-how to enable the manufacture of infringing devices; and (ix) otherwise enabling and encouraging the use, sale, or importation of infringing devices.

55.     For example, in addition to the above reproduced images, the following video further exemplifies how Defendants infringe and induce end-users to infringe:



Samsung US, *Galaxy S10: How to Use Wireless PowerShare*, YOUTUBE.COM (May 17, 2019).[5] This video has been promoted to at least Defendants' approximately 1.92 million subscribers of Defendants'' "Samsung US" YouTube channel.

56.     As a result, Defendants knew that the induced conduct would constitute infringement,

---

[5] Available at https://www.youtube.com/watch?v=OdhWtnIPJn4 (last visited Aug. 13, 2020).

and intended that infringement at the time of committing the aforementioned acts, such that the acts and conduct have been and continue to be committed with the specific intent to induce infringement, or deliberately avoiding learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

57. Defendants have contributed and continue to contribute to the direct infringement of the '067 Patent, specifically at least claims 1 and 15, by each other, their customers, testers, marketers, end-users, and other third parties.

58. Defendants import, export, make or sell devices, parts, components, or intermediate products to customers, testers, marketers, end-users, and other third parties that when used, sold, or offered for sale infringe upon the '067 Patent, specifically at least claims 1 and 15.

59. Defendants make, use, sell, and/or offer to sell infringing devices which are especially made to design and specification, and are not staple products or commodities with substantial noninfringing use.

60. For example, the Accused Products include specialized hardware and software, including integrated circuits, coil assemblies, and user-interface software as exemplified in <u>Exhibit B</u>.

61. Defendants knew of or were willfully blind to the specialized and non-commodity nature of the infringing devices, and the lack of substantial noninfringing uses.

62. Defendants have failed to take adequate steps to determine whether or not they were infringing or would infringe the '067 Patent, despite having been on actual notice of and lacking permission to practice the '067 Patent.

    **C.**    <u>**Harm to GPS**</u>

63. Accordingly, Defendants are liable for infringement of the '067 Patent and their infringement has been and continues to be willful and egregious in nature.

64. Plaintiff GPS has incurred and will continue to incur substantial damages, including monetary damages.

65. Plaintiff GPS has been and continues to be irreparably harmed by Defendants'

infringement of the '067 Patent for which there is no adequate remedy at law unless enjoined. *Inter alia*, Defendants failure to take a license (and failure to negotiate in good faith) casts a cloud over Plaintiff, Mr. Garrity, and associated entities that is particularly damaging to heir reputations as technology innovators that is essential to their business.

66. Therefore, Plaintiff GPS is entitled to an injunction, actual and/or compensatory damages, reasonable royalties, pre-judgment and post-judgment interest, enhanced damages, and costs.

## V. PRAYER FOR RELIEF

67. WHEREFORE, Plaintiff GPS respectfully requests that this Court:

- Enter judgment in favor of GPS that the '067 Patent is valid and enforceable;

- Enter judgment in favor of Plaintiff GPS that Defendants have infringed and continue to infringe the '067 Patent, and finding that such infringement is willful and egregious;

- Award Plaintiff GPS all monetary relief available under the patent laws of the United States, including but not limited to actual and/or compensatory damages, reasonable royalties, pre-judgment and post-judgment interest, enhanced damages, and costs pursuant to 35 U.S.C. § 284;

- Order Defendants to pay ongoing royalties in an amount to be determined for any continued infringement after the date that judgment is entered;

- Declare this case exceptional and award Plaintiff GPS its reasonable attorney fees pursuant to 35 U.S.C. § 285;

- Enjoin each Defendant, its officers, subsidiaries, agents, servants, and employees, and all persons in active concert with any of the foregoing, from further infringement of the '067 Patent; and

- Grant Plaintiff GPS all such other relief as the Court deems just and

equitable.

## VI.   DEMAND FOR JURY TRIAL

68.     Plaintiff GPS, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

DATED August 17, 2020.                          Respectfully submitted,

*/s/ Jaspal S. Hare*
By: _____

Jaspal S. Hare (lead counsel)
Texas Bar No. 24083135 (admitted in E.D. Tex.)
jhare@spencerfane.com
Ryan G. Cole
Texas Bar No. 24028056 (admitted in E.D. Tex.)
rcole@spencerfane.com
SPENCER FANE LLP
5700 Granite Parkway, Suite 650
Plano, TX 75024
Tel: (972) 324-0300
Fax: (972) 324-0301

Kyle L. Elliott
Missouri Bar No. 49145 (to appear *pro hac vice*)
kelliott@spencerfane.com
SPENCER FANE LLP
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Tel: (816) 474-8100
Fax: (816) 474-3216

Elizabeth L. DeRieux (admitted in E.D. Tex.)
Texas Bar No. 05770585
ederieux@capshawlaw.com
CAPSHAW DERIEUX, LLP
114 E. Commerce Ave.
Gladewater, TX 75647
Tel: (903) 845-5770

*Attorneys for Plaintiff*
*Garrity Power Services LLC*